IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 1, 2017

# IN RE JABARI B.[1]

**Appeal from the Juvenile Court for Davidson County**
**No. 219847      Sheila Calloway, Judge**

_____

## No. M2017-00557-COA-R3-PT

_____

This appeal involves the termination of a mother's parental rights to her minor child. Following a bench trial, the trial court found that clear and convincing evidence existed to support the termination of the mother's parental rights on the statutory grounds of abandonment for failure to provide a suitable home, substantial noncompliance with the requirements of the permanency plan, and the persistence of conditions which led to removal. The court further found that termination of the mother's rights was in the best interest of the child. The mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S. and BRANDON O. GIBSON, J., joined.

C. Michael Cardwell, Nashville, Tennessee, for the appellant, Tasha B.

Herbert H. Slatery, III, Attorney General and Reporter, and Kathryn A. Baker, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

---

[1] This Court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

**OPINION**

## I.     BACKGROUND

Jabari B. was born to Tasha B. ("Mother") and William L. ("Father") (collectively "the Parents") in March 2010.  Mother and Father never married.  Father was not listed on the Child's birth certificate; however, Mother identified him as the father.  He also held himself out as the father.

The Tennessee Department of Children's Services ("DCS") removed the Child from the Parents in the early morning hours of May 26, 2015, based upon an allegation of abandonment.  The record reflects that the Parents were without housing and took up residence with a couple they recently met a few days prior to the Child's removal.  On May 25, 2015, the Parents left the Child with the couple to purchase marijuana.  The couple notified DCS that the Child had been abandoned when the Parents did not promptly return with the marijuana.  The Parents later claimed that the couple advised them that they could not stay unless they provided them with marijuana.  The Child was adjudicated as dependent and neglected by order of the court, entered on February 2, 2016, due to their placement of the Child in a position of improper guardianship and by making the poor decision to leave him with strangers while they purchased marijuana.

Two permanency plans were entered, one on July 13, 2015, and a revised plan on April 6, 2016, each of which contained the following requirements for each parent:  (1) obtain and maintain stable housing; (2) complete a parenting assessment and follow recommendations; (3) complete a mental health assessment and follow recommendations; (4) submit to random drug screens; (5) resolve legal issues; and (6) participate in meetings and the Child's medical and educational appointments.  These plans were ratified by the trial court.  The record reflects that neither parent failed a drug screen while the Child was in DCS custody and that allegations of drug abuse were unfounded.

DCS filed a petition to terminate Mother's parental rights on June 3, 2016, based upon the statutory grounds of abandonment for failure to remit support, to visit, and to provide a suitable home; substantial noncompliance with the permanency plan; and the persistence of conditions which led to removal.[2]  The case proceeded to a hearing in October 2016.  At that time, Mother still had not obtained stable housing, attended parenting classes as indicated following her completion of the parenting assessment, or completed a psychological assessment as indicated.  She also did not appear for the Child's assessments or attend meetings regarding the Child's care.

---

[2] DCS also sought termination of Father's parental rights.  He is not a party to this appeal.

As pertinent to this appeal, Krishana Overstreet, a family service worker for DCS, testified that she has been assigned to this case since the Child's entry into custody. She noted that this was her first case as a DCS employee and that she worked with Carla Ballard in providing services. She provided that Mother has only attended one child and family team meeting. She noted that Mother was also present for one foster board hearing, a permanency plan staffing, and a court hearing

Ms. Overstreet asserted that housing has been an issue throughout the tenure of the case. While Mother had a permanent mailing address with her maternal family, she was living in shelters or hotel rooms with Father. Ms. Overstreet offered to provide services but was told that housing had been secured; however, Mother's leasing information was never supplied as requested. She later visited an address supplied by Mother in August 2015, but there was no answer to her knock on the door. Further, there was no indication that anyone lived there. Mother later confirmed that she no longer lived at that address. She stated that Mother's only confirmed residence was at Mother's grandmother's house. There was not enough space in the home for the Child to reside, and those living there indicated that the Child could not live there.

Ms. Overstreet stated that she provided a list of housing resources and provided applications for special housing programs. She claimed that Mother never followed up on the resources provided by her. Instead, Mother advised her that she was on a waiting list for several other housing programs. However, Ms. Overstreet called the programs and found no indication that Mother had actually filed an application.

Ms. Overstreet stated that Mother was approved for visitation supervised by her and also had therapeutic visitation services through Camelot. She moved visitation to several different locations and at different times, including the weekend to accommodate her. She even provided bus passes for approximately two months. Mother failed to arrive on time and attend regularly until February 2016. She acknowledged that since that time, the Child responded positively and was responsive to Mother during visitation.

Ms. Overstreet stated that Mother did not participate in the development of the permanency plans but was present when the court ratified the plans.[3] Mother completed her parenting assessment in February 2016. The recommendations were as follows: attend intensive parenting classes, complete a psychological assessment, and receive counseling for victims of domestic violence and attend a support group.[4]

---

[3] The Parents also refused to sign the Criteria for Termination of Parental Rights.

[4] Ms. Overstreet explained that Mother indicated that Father had attacked her in October 2015. Based upon this allegation, she made sure that visitations were not scheduled at the same location.

Ms. Overstreet testified that Mother failed to attend parenting classes or complete a psychological assessment following her completion of the parenting assessment. She stated that she scheduled the psychological assessment and even provided transportation but that Mother was not at the address provided by Mother at the scheduled time. She noted that the driver waited for Mother for a full hour before finally leaving.

Ms. Overstreet stated that the Child was eligible for the regional intervention program that would allow Mother the opportunity to receive instruction on how to address the Child's behavioral issues. Mother failed to participate. However, she did participate in the development of the Child's Individualized Education Program ("IEP") and attended a meeting in April 2016.

Ms. Overstreet recalled that at the time of removal, the Child did not speak and was not prepared for entry into school, meaning he did not know "shapes or colors or objects that children of his age should . . . know." She provided that he was developmentally delayed by approximately two years. She believed he has made a "complete turnaround." She stated,

> [The Child] was unable to speak or interact with anyone other than people he had known. He could not tell you what his name was. He knew his mom and his dad's name, and that was pretty much it. We would ask him questions. He was nonverbal – his standard was really low for how old he was. He talks now. He communicates with other people. He has a best friend.
>
> He was kind of – the only way to describe it, he was, in a sense, almost feral how he was initially at the daycare center he was at. He would take off his clothes and run around. He would bite and kind of hit the other students at that last daycare. He actually got dismissed from the daycare several times a week because of his behaviors.

She claimed that the Child is now doing "exceptionally well" even though he is still delayed. She acknowledged that the Child cared for the Parents but explained that his relationship with them was more of a friendship than a parental relationship.

Ms. Overstreet stated that the Child lives in a foster home with another child. She provided that he was "extremely attached" to the child and referred to her as his sister. She believed returning him to Mother at this point would diminish the progress he has achieved. She expressed doubt as to whether Mother was capable and willing to adequately address his needs or even her needs as evidenced by her continued lack of

housing. She noted that the Child's foster mother worked with him and even decorated his room in an effort to further assist him in learning and identifying objects.

Mother denied knowledge concerning the various requirements contained in the permanency plans. However, she agreed that there were certain tasks she was required to complete to regain custody of the Child. She testified that she has attempted to secure housing but that she has been repeatedly advised by various housing developments to wait until the following year. She asserted that Ms. Overstreet never provided her with housing resources or offered to assist her in completing a housing application. She provided that Ms. Overstreet did not "want to be bothered" with her because of threats made by Father. She stated that she secured housing in November and December 2015 in a rooming house and that she provided Ms. Overstreet with the address. She later left the rooming house when the rent increased. She stated that she has completed approximately 30 housing applications since that time.

Mother asserted that she completed her parenting assessment in February 2016. She explained that she was unable to complete it before that time because of her work schedule during the holidays. She failed to attend her psychological assessment because Ms. Overstreet only provided one day's notice. She explained that she was scheduled to work that day and could not leave work. She further claimed that she could not attend parenting classes because Ms. Overstreet failed to file the appropriate paperwork in time. She denied receiving a list of classes and asserted that she telephoned Ms. Overstreet to request assistance but that Ms. Overstreet did not return her call. She acknowledged her failure to attend the Child's medical appointments but claimed that she was unable to attend due to her work schedule and lack of transportation. She stated that she has also not received notice of any recent medical appointments or a copy of the Child's IEP.[5]

Mother acknowledged that the Child exhibited signs of a speech delay at the time of removal. She claimed that she was attempting to address the issue but had trouble scheduling appointments through her insurance. She noted that he was on a waiting list at Vanderbilt to address his speech and at Tom Joy Head Start prior to his removal.

Mother testified that she consistently maintained visitation when able and provided toys and clothing at visitation. She explained that she scheduled her own visitation through Camelot in December but that she missed visitation in January because

---

[5] Ms. Overstreet testified in rebuttal that she experienced communication issues with Mother and explained that Mother often claimed that she was not advised of certain appointments and denied receipt of documents. She stated that due to their communication issues, she began to document their communications, mailed notices and other information by certified letter, or required Mother to sign documents indicating her receipt of said document. Several of said documents were identified and accepted into the record.

Ms. Overstreet failed to return her calls. She described a loving relationship between herself and the Child and claimed that she wished she could take him home with her. She acknowledged that her housing remained unstable. She explained,

> I've been trying to do a lot of things for my son. And even though they say I don't care about him, I have tried to do everything. I always want to see him. I bring him stuff, not because the people want me to do things. I've been trying to do things for my son. I've been caring, loving. I tell him I love him. I don't know what he's going through at school, but I just pray and hope that things get better with him and everything.

Foster Mother testified that she is employed and able to provide for the Child and another child in her home that she adopted in 2015.[6] She stated that the Child has resided with her since the time of his removal and has adjusted well to her home and other children. She noted that the Child did well in a special needs setting but that he had exhibited some behavior problems recently. She believed it was a result of his adjustment to the new school year with a new teacher. She expressed love and concern for the Child and indicated intent to adopt if he were available for adoption.

Foster Mother testified that the Child exhibited signs of excitement prior to visitation with Mother but that he was often "quiet" upon return and then would have "outbursts" at school following visitation days. She agreed that Mother has provided the Child with clothes and a birthday cake.

Following the hearing, the trial court rejected the grounds of abandonment for failure to remit support or to visit. However, the court found clear and convincing evidence to support termination of Mother's parental rights based upon abandonment for failure to provide a suitable home; substantial noncompliance with the permanency plan; and the persistence of conditions which led to removal. The court further found that termination of her parental rights was in the best interest of the Child. Mother timely filed a notice of appeal signed by her attorney but not signed personally by Mother.

## II.    ISSUES

We consolidate and restate the issues on appeal as follows:

A.    Whether Mother's unsigned notice of appeal was jurisdictionally deficient.

---

[6] Her adult son also lives with her and helps her with the children.

B.     Whether clear and convincing evidence supports the court's termination of Mother's parental rights based upon a finding of abandonment for failure to provide a suitable home pursuant to Tennessee Code Annotated section 36-6-102(1)(A)(ii).

C.     Whether clear and convincing evidence supports the court's termination of Mother's parental rights based upon a finding of substantial noncompliance with the permanency plan pursuant to Tennessee Code Annotated section 36-1-113(g)(2).

D.     Whether clear and convincing evidence supports the court's termination of Mother's parental rights based upon the persistence of conditions which led to removal pursuant to Tennessee Code Annotated section 36-1-113(g)(3).

E.     Whether clear and convincing evidence supports the court's finding that termination of Mother's parental rights was in the best interest of the Child pursuant to Tennessee Code Annotated section 36-1-113(i).

## III.     STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon:

(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination

of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (internal citations omitted).

## IV. DISCUSSION

### A.

As a threshold issue, we must consider first whether Mother's unsigned notice of appeal was jurisdictionally deficient. DCS argued in its responsive brief that this court lacks jurisdiction to consider the appeal because the notice of appeal is not signed personally by Mother as required by Tennessee Code Annotated section 36-1-124(d), which provides as follows:

> Any notice of appeal filed in a termination of parental rights action shall be signed by the appellant.

Mother responded with a motion to amend her notice of appeal to comply with Section 36-1-124(d). We reserved ruling on the motion pending completion of the briefing schedule and submission of the case to the court for a decision.

During the pendency of this appeal, our Supreme Court held that Section 36-1-124(d) "does not establish a jurisdictional requirement." *See In re Da'Vante M.*, No. M2017-00989-COA-R3-PT, 2017 WL 6346056, at *10 (Tenn. Ct. App. Dec. 12, 2017) (relying upon the Court's decision in holding that a notice of appeal not signed personally by the appellant was not jurisdictionally deficient). The Court stated as follows:

> Tennessee Code Annotated section 36-1-124(d) does not distinguish between the appellant and his or her attorney. If the General Assembly had intended to make such a distinction, then it could have done so by requiring both the appellant and the appellant's attorney to sign the notice of appeal.

> Because section 36-1-124(d) does not require the appellant to sign "personally" the notice of appeal and does not distinguish the appellant from his or her attorney, we conclude that the word "appellant" includes an attorney specifically authorized to file a notice of appeal on the appellant's behalf. We emphasize that no appeal should be taken in a termination of parental rights proceeding without specific authorization from the client.

Construing the signature requirement of section 36-1-124(d) to require specific authorization for a notice of appeal signed by an appellant's attorney strikes the appropriate balance between protecting the fundamental rights of parents and acting in the best interests of children.

*In re Bentley D.*, —— S.W.3d ——, ——, 2017 WL 5623577, at *5 (Tenn. Nov. 22, 2017) (internal citations and footnotes omitted). Here, Mother's counsel signed her notice of appeal based upon her specific instructions as counsel of record in the termination proceeding. Accordingly, we hold that the notice of appeal was not jurisdictionally deficient in keeping with the Supreme Court's decision in *In re Bentley D.*

B.

A parent may be found to have abandoned his or her child by failing to establish a suitable home. The relevant statutory provision provides, in pertinent part, as follows:

The child has been removed from the home of the [parent] as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child [ ], and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the [parent] to establish a suitable home for the child, *but that the [parent has] made no reasonable efforts to provide a suitable home and [has] demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.* The efforts of the department or agency to assist a [parent] in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the [parent] toward the same goal, when the [parent] is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (emphasis added). Termination for failure to provide a suitable home requires a finding, supported by clear and convincing evidence that a parent failed to provide a suitable home for his or her child even after DCS assisted

that parent in his or her attempt to establish a suitable home.[7]  Tenn. Code Ann. § 36-1-102(1)(A)(ii).  DCS is required to use its "superior insight and training to assist parents . . . whether the parents ask for assistance or not."  *State, Dep't of Childrens Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008).

Mother argues that DCS failed to assist her in her search for housing but that she made reasonable efforts during the pertinent time period, May 26, 2015, through September 26, 2015, as evidenced by her acquisition of housing in August 2015 and again in November and December 2015.  She concedes that her residency lasted a short time but argues that her efforts were reasonable and not demonstrative of a lack of concern for the Child.  The record does not support Mother's claim that DCS failed to assist her in securing suitable housing.  Mother simply failed to accept the assistance provided.  While we commend Mother for obtaining housing on two separate occasions, she failed to maintain said housing long enough for DCS to even confirm her residency and its suitability for the Child.  Mother was still without housing at the time of the hearing.  Her failure to properly address her living situation demonstrates a lack of concern for the Child such that it appears unlikely that she will be able to provide a suitable home at an early date.  With these considerations in mind, we conclude that there was clear and convincing evidence to establish that Mother abandoned the Child by failing to provide a suitable home.

C.

Tennessee law requires the development of a plan of care for each foster child and further requires that the plan include parental responsibilities that are reasonably related to the plan's goal.  Tenn. Code Ann. § 37-2-403(a)(2)(A).  A ground for termination of parental rights exists when a petitioner proves by clear and convincing evidence that "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan."  Tenn. Code Ann. § 36-1-113(g)(2).  To establish noncompliance, the trial court must initially find "that the requirements of the permanency plans are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place."  *In re M.J.B.*, 140 S.W.3d at 656; *see In re Valentine*, 79 S.W.3d at 547.  When the trial court does not make such findings, the appellate court should review the issue de novo.  *In re Valentine*, 79 S.W.3d at 547.  Second, the court must find that the parent's noncompliance is substantial, *In re M.J.B.*, 140 S.W.3d at 656, meaning that the parent must be in

---

[7] Our Supreme Court specifically overruled the progeny of cases requiring "DCS to prove by clear and convincing evidence that it made reasonable efforts to reunify as a precondition to termination of parental rights."  *In re Kaliyah S.*, 455 S.W.3d 533, 555, n. 34 (Tenn. 2015).  However, that holding does not abrogate DCS's responsibility to make reasonable efforts to assist parents in establishing a suitable home pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(ii).

"noncompliance with requirements in a permanency plan that are reasonable and related to remedying the conditions that warranted removing the child from the parent's custody." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). To assess a parent's substantial noncompliance with a permanency plan, the court must weigh "both the degree of noncompliance and the weight assigned to that particular requirement." *Id.* at *12. Conversely, "[t]erms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *In re Valentine*, 79 S.W.3d at 548-49.

Here, the permanency plans required Mother to (1) obtain and maintain stable housing; (2) complete a parenting assessment and follow recommendations; (3) complete a mental assessment and follow recommendations; (4) submit to random drug screens; (5) resolve legal issues; and (6) participate in meetings and the Child's medical and educational appointments. At the time of the hearing, Mother had not obtained stable housing, attended parenting classes as recommended, or completed a psychological assessment as recommended. She also did not appear for the Child's assessments or attend meetings regarding the Child's care. These requirements were not only reasonable and related to remedying the conditions that warranted removal, namely unsuitable housing and questionable decision-making concerning the Child's care, but completion of these requirements were essential for establishing that Mother could care for the Child. Throughout the trial and now on appeal, Mother attempts to place the blame for her failure to complete these requirements in a timely manner on Ms. Overstreet. The record reflects that Mother failed to even complete the parenting assessment until February 2016, approximately seven months after the entry of the initial permanency plan, thereby lessening the time available to complete the recommendations from the assessments. Further, Mother failed to attend a scheduled psychological assessment even though transportation was provided by DCS. With these considerations in mind, we conclude that there was clear and convincing evidence to establish that Mother failed to substantially comply with the requirements of the permanency plan.

D.

Under Tennessee law, a court may terminate parental rights when:

(3)     The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A)     The conditions that led to the child's removal *or other conditions* that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

- 12 -

(B)    There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C)    The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3) (emphasis added).  Termination of parental rights requires clear and convincing evidence of all three factors.  *In re Valentine,* 79 S.W.3d at 550.  Additionally, the persistence of conditions ground may only be applied "where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.,* 182 S.W.3d at 874.

On appeal, DCS does not defend the ground of persistence of conditions because the final order adjudicating the Child as dependent and neglected was filed less than six months prior to the termination petition.  The record confirms that the final order was entered on February 1, 2016, and that the termination petition was filed on June 3, 2016.  Section 36-1-113(g)(3) does not require reliance upon the *final* order of adjudication.  However, this court has held that the removal must be by order of the court *based upon* a judicial finding of dependency, neglect, or abuse.  *In re Audrey S.,* 182 S.W.3d at 874.  While the magistrate found probable cause to believe the Child was dependent and neglected by order entered on May 27, 2015, the record is devoid of evidence of an order actually finding the Child as such until entry of the final order on February 1, 2016. *See id.* at 875-76 (holding that a finding of probable cause that the child at issue was dependent, neglected, or abused was insufficient to sustain a court's termination decision based upon Section 36-1-113(g)(3)).  Accordingly, we hold that the court erred in relying upon Section 36-1-113(g)(3) in terminating Mother's parental rights.  This conclusion does not require reversal because only one statutory ground is required to support the termination of parental rights.  Tenn. Code Ann. § 36-1-113(c).

E.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground to terminate each parent's parental rights, we must consider whether termination was in the best interest of the Children.  In making this determination, we are guided by the following non-exhaustive list of factors:

(i)    In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;[8]

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

---

[8] *In re Kaliyah S.*, 455 S.W.3d at 555 ("[I]n a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent.").

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

A number of the best interest factors weigh against Mother. She has not made the adjustment of circumstances necessary to make it safe and in the Child's best interest to return home. Indeed, the record reflects that she still has not obtained and maintained stable housing for herself and the Child. Tenn. Code Ann. § 36-1-113(i)(1), (2), (7). The Child resides in a safe and stable home that is willing and able to adopt him. Removing him would negatively affect his emotional condition. Tenn. Code Ann. § 36-1-113(i)(5). Questions remain concerning her mental and/or emotional status as evidenced by her failure to complete a psychological assessment as indicated required. Tenn. Code Ann. § 36-1-113(i)(8).

While we do not wish to discount Mother's love for the Child, the Child is in need of permanency and a stable home that Mother has shown she cannot provide now or in the near future. With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of Mother's parental rights was in the best interest of the Child. We affirm the decision of the trial court.

## V.    CONCLUSION

This judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Tasha B.

_____

JOHN W. McCLARTY, JUDGE